IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| M-I LLC,<br><br>    Plaintiff,<br>  v.<br><br>FPUSA, LLC,<br><br>    Defendant. | CIVIL ACTION NO. 5-15-CV-00406 (DAE)<br><br>*Jury Trial Requested* |

**PLAINTIFF M-I LLC'S
MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff M-I LLC ("M-I") received U.S. Patent 9,004,288 on April 14, 2015. Defendant FPUSA, LLC ("FP"), a subsidiary of Canadian company FP Marangoni, Inc. ("FP Marangoni") is seeking to grow and expand its business in the United States for the patented technology. M-I therefore requests a preliminary injunction to prevent FP from avoiding the exclusionary rights awarded a patentee, and eroding the United States market for the patented technology.

**I.     SUMMARY OF THE ARGUMENT**

The technology at issue in this case relates to the recovery of drilling fluid, the lifeblood of drilling an oil or gas well. M-I is in the business of supplying drilling fluid and related equipment and services. In 2006, M-I's inventor, Brian Carr, came up with a unique idea of applying a pressure differential to a section of a shaker screen to enhance that recovery, resulting in substantial savings for drilling companies and more environmentally friendly disposal. Specifically, by applying the pressure differential, air is drawn through the shaker screen, pulling the drilling fluid from the cuttings and increasing the recovery of drilling fluid from the drill

cuttings.[1]

M-I saw the value of this idea since inception. At least four years after M-I filed its provisional patent application and at least two years after M-I's patent application published, FP Marangoni realized the value of this idea and began offering a Vac-Screen system in Canada that generated a pressure differential across a screen.[2] While M-I continued development of a product incorporating Mr. Carr's unique idea, M-I chose to rent a component (trays) of this Vac-Screen system from FP Marangoni and marketed the product as MAXIMIZER in the United States. Soon after those rentals began and M-I established a market for MAXIMIZER, FP Marangoni created a U.S. counterpart company, Defendant FP, seemingly for the purpose of facilitating the relationship with M-I. Instead, FP has sought to enter its own Vac-Screen product into the U.S. marketplace in violation of M-I's patent rights. M-I respectfully seeks the Court's assistance to maintain the status quo by preventing patent infringement, erosion of market share, and the loss of customer goodwill and reputation in the United States.

## II. FACTUAL BACKGROUND

### A. Overview of Technology

Drilling fluids serve an instrumental purpose in the drilling process, lubricating and cooling the drill bit as well as conveying the drilled cuttings away from the bore hole. Drilling fluids are a mixture of various chemicals in either a water or oil based solution and typically are very expensive to make. To reduce the cost of drilling operations, as well as minimize the impact on the environment, operators seek to recover and reuse as much drilling fluid as

---

[1] In further detail, on September 29, 2006, Provisional Application Nos. 60/827,567 and 827,542 were filed. On September 27, 2007, Brian Carr filed a patent application (11/862,955), claiming priority to both of these earlier Provisional Applications, which issued as U.S. Patent No. 8,613,360 ("the '360 patent"). On March 18, 2013, Brian Carr filed another continuation application claiming priority to these applications, which has now issued as the '288 Patent.

[2] The ideas and concepts disclosed in Carr's applications published on April 3, 2008, with U.S. Patent Application Publication 2008/0078699.

2

possible. One type of equipment that is important to this process is a shale shaker. Shakers are the first phase of a solids control system on a drilling rig, and are used to remove large solids (cuttings) from the drilling fluid.

A shaker, such as the M-I Mongoose® shaker shown at right, includes a basket that serves both as a platform for the screens and vibrates with respect to a housing that collects the drilling fluid passing through the screens. Screens are used with shale shakers and are typically placed in a horizontal fashion on a generally  horizontal bed or support within the basket in the shaker. The basket, in which the screens are mounted, may be inclined towards a discharge end of the shale shaker. The shale shaker imparts a rapidly reciprocating motion to the basket and hence the screens. As the slurry (a mixture of drilling fluid and drilled cuttings) is fed onto the shaker bed, the vibrating shaker screens separate drilling fluid from drilled cuttings and other solid components, and the drilling fluid falls through each screen into the housing below.

**B.     The M-I Patented Technology**

In 2006, Brian Carr had an idea on how to improve shakers and the drilling fluid recovery process, and he filed patent applications in the United States Patent and Trademark Office ("USPTO") on these ideas. One of those applications has now issued as U.S. Patent No. 9,004,288 ("the '288 Patent", **Exhibit A**). As shown at right, the '288 Patent includes Figure 4, which illustrates a shaker having several screens  (**92**). A sump (**96**) has been provided under screens **92A** and **92B**. One embodiment of Mr.

Carr's inventions is disclosed in the '288 Patent. An outlet (**98**) connects to a pressure differential device (not shown) and creates the pressure differential across the screens. This pressure differential pulls an effective volume of air through the screen and improves drilling fluid recovery as well as the effective flow of drill cuttings off the shaker.

One or more sumps may be located under the screens such that a pressure differential may be provided across one screen, two screens, or more. **Exhibit A**, col. 7, line 8-14. Adjusting the effective volume of air pulled through the screen prevents stalling of drill cuttings as the slurry passes across the screen. **Exhibit A**, col. 4, lines 29-31 and 49-51.

Figure 6, shown at right, shows a side view of other aspects of an embodiment of Mr. Carr's invention. More specifically, screen (**204**) is installed on top of the sump (or tray) (**206**). To generate the desired pressure differential across the screen **204,** the sump **206** may be fluidly connected via flow line **213** to a  degassing chamber **212** and a pressure differential device **216**. Various types of pressure differential devices are disclosed in the '288 Patent, including pumps, blowers, aspirators, ejectors. *See* **Exhibit A**, col. 6, lines 15-20. Useful pumps include reciprocating pumps, centrifugal pumps, vacuum pumps, and many others. *See* **Exhibit A**, col. 6, lines 21-27.

On December 24, 2013, M-I received a first U.S. Patent, No. 8,613,360 related to the Carr inventions. M-I's second patent, the '288 Patent at issue in this lawsuit, issued on April 14, 2015.

    C.    **M-I's Efforts To Accommodate Its Customers With A Commercial Product**

As described above, the technology introduced by Mr. Carr effectively removes costly drilling fluid from the drilled cuttings, thus, reducing the amount of cuttings waste to be

4

disposed.  This improves the revenue stream of the drilling operator, and thus, M-I planned to commercialize the embodiments of the '288 Patent for the benefit of its customers.  However, in 2010, years after the Carr patent application published, FP Marangoni approached M-I with its Vac-Screen system (discussed below).  **Exhibit B**; Declaration by Nestor Daboin, Vice President of North America Land for M-I ("Daboin Declaration"), ¶3.  During that same timeframe, FP Marangoni purportedly began offering the Vac-Screen system in Canada.  See **Exhibit B**.

Having not yet developed its own product, M-I rented the drop-in trays of the Vac-Screen system from FP Marangoni.  See, Daboin Declaration, ¶4.  M-I offered FP's trays with M-I's pressure differential technology in the U.S. market and branded it as M-I's MAXIMIZER.  Daboin Declaration, ¶5.  Branding under M-I's name was important.  Id.  Branding maintained M-I's customer base and grew M-I's name recognition.  Id.  In addition, by offering M-I's MAXIMIZER as an add-on service, M-I had the visibility on the rig site to offer other revenue earning opportunities, e.g., selling of replacement shaker screens, centrifuge services, additional drilling fluid, and even the sale of an M-I shale shaker.  Daboin Declaration, ¶6.  Although M-I shared revenue with FP Marangoni, M-I kept the United States market only visible to the customers as M-I.  Daboin Declaration, ¶5.

At some point, during the relationship, it became clear that Defendant FP intended to compete directly against M-I's MAXIMIZER in the United States with its Vac-Screen system.  Daboin Declaration, ¶7 and Carter Declaration, ¶6.  Accordingly, M-I focused on completing the commercialization of the M-I patented technology and protecting that invention with U.S. Patents.  Daboin Declaration, ¶8.

        **D.**    **M-I's Commercialization Of Screen Pulse**

M-I's recently commercialized Screen Pulse system is shown below.  Screen Pulse is a simple retrofit installation for M-I's Meerkat and Mongoose®  series shakers.  **Exhibit C**, p.3

[Screen Pulse Brochure]. Screen Pulse practices the technology of the '288 Patent.

A sump (or tray) is installed underneath the last shaker screen.  **Exhibit C**, p.4. An outlet connected to the sump is fluidly connected to the pressure differential device, shown at right. M-I's Screen Pulse creates suction which gently pulls residual drilling fluid from the cuttings as the slurry is processed by the shaker. *Id.*



Depending on the pool depth control, Screen Pulse routinely allows the recovery of 5-30 bbl/day with an average daily recovery rate of 15 bbl, depending on the site specifics. *Id.*

### III.   ARGUMENT AND AUTHORITIES

The purpose of a preliminary injunction is "to preserve the status quo pending a determination of the action on the merits." *Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir. 1984). Preserving the status quo, however, does not include continuing past infringement, merely that the injunction "not undertake to assess the pecuniary or other consequences of past trespasses." *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1232 (Fed. Cir. 1985). A preliminary injunction should be granted when:

(1)   the plaintiff has a reasonably likelihood of success on the merits;

(2)   the plaintiff has suffered irreparable injury;

(3)   the balance of the hardships weigh in favor of the injunction; and

(4) the public interest would not be disserved by the injunction.

*Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2009); *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1374 (Fed. Cir. 2006) (affirming grant of preliminary injunction); *see also, eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-92 (2006) (holding that traditional principles of equity "apply with equal force to disputes arising under the Patent Act"). Courts should balance these four factors as their relative weights warrant. *Monsanto Co. v. McFarling*, 302 F.3d 1291, 1297 (Fed. Cir. 2002). A strong showing on one factor can compensate for a less strong position on another. *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990). M-I makes a strong showing on all factors.

As detailed below, FP is infringing at least claims 1 and 16 of the '288 Patent, and claims 1 and 16 are valid and enforceable. If FP is not enjoined, M-I will be irreparably harmed, its pricing and market share for the patented technology will erode, and M-I's good will and reputation will be diminished. As such, monetary damages alone cannot make M-I whole. Furthermore, FP should not be allowed to take advantage of M-I's investment of the time and resources in developing the patented technology. Additionally, it is in the public interest to enforce patents which encourages others to invent and utilize the patent system. Finally, M-I is willing to post a sufficient bond as determined by the Court in support of M-I's Motion for Preliminary Injunction. Accordingly, for the reasons set forth herein, the Court should grant M-I's requested preliminary injunction in this matter.

### A. Success on the Merits

To demonstrate a likelihood of success on the merits, M-I must show that it will likely prove infringement of one or more claims and that at least one of those claims is likely to withstand an invalidity challenge. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001); *Wireless Agents, LLC v. Sony Ericsson Mobile Commc'ns*, 390

F. Supp. 2d 532, 535 (N.D. Tex. 2005). An issued patent is presumed valid, and "the burden of persuasion to the contrary is and remains on the party asserting invalidity." *Ralston Purina Co. v. Far-Mar-Co., Inc.*, 772 F.2d 1570, 1573 (Fed. Cir. 1985); *Impax Labs., Inc. v. Aventis Pharm., Inc.*, 468 F.3d 1366, 1378 (Fed. Cir. 2006); 35 U.S.C. Sect. 282 ("A patent shall be presumed valid."). A patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009). The high likelihood M-I will succeed on both infringement and validity are discussed below.

### i. **Infringement**

The '288 Patent includes both claims to a method of processing drilling fluid and drilled cuttings and to the equipment. Exemplary method claim 1 of the '288 Patent reads as follows:

> 1. A method comprising:
> introducing a shiny [sic]³ to a shaker having a first screen and a
>     second screen;
> flowing the slurry over the first screen;
> applying a first pressure differential to the first screen and not
>     applying the first pressure differential across the second screen;
>     and
> controlling air flow under at least a portion of the first screen to
> prevent stalling of the slurry on the screen.

**Exhibit A**, col. 11, lines 43-51. Exemplary apparatus claim 16 of the '288 Patent reads as follows:

> 16. A system comprising:
> a first screen having an upper site and a lower side for separating
>     drill cuttings and drilling fluid within a shaker;
> a pressure differential generator configured to pull air or vapor
>     through the first screen to enhance the flow of drilling fluid
>     through the first screen with respect to a second screen within
>     the shaker in which the pressure differential generator does not

---

³ On April 30, 2015, a certificate of correction was been filed for the '288 patent, correcting the typographical errors incurred by the Patent and Trademark Office, attached as **Exhibit A-1**. The term "shiny" should read "slurry".

8

> create a pressure differential between an area above and an area below the second screen; and
>
> a sump located below the first screen and configured to collect the air or vapor and the drilling fluid that passes through the first screen; and
>
> a degassing chamber in fluid communication with the pressure differential generator and the swap [sic][4] and located external to the shaker for collecting all of the air or vapor and the drilling fluid in the sump and removing air or vapor from the drilling fluid.

**Exhibit A**, col. 11, lines 43-51.

To prove infringement, M-I must show that the accused FP method or product meets each claim limitation either literally or under the doctrine of equivalents. *See, e.g., Planet Bingo, LLC v. GameTech Int'l, Inc.*, 472 F.3d 1338, 1343 (Fed. Cir. 2006); *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1340 (Fed. Cir. 2005) (citing *Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys.*, 347 F.3d 1314, 1324 (Fed. Cir. 2003)). The claim language defines the scope of a patent's claims. *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005)(en banc) ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.") (internal quotes omitted). The specification and prosecution history, i.e., the intrinsic evidence, are the best guides to claim scope if there is a legitimate disagreement over the scope of the claims. *See id*. at 1314. However, claim terms that can be readily understood by one skilled in the art or a lay juror do not need construction. *See id*.

A patent may be infringed directly or indirectly. *See* 35 U.S.C. Sec. 271(a)-(c). Direct infringement is a strict-liability offense, but it is limited to those who practice each and every element of the claimed invention. *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, Nos 2009-1372, 2009-1417, 2009-1380, 2009-1416, 2015 WL 2216261, at *1-2 (Fed. Cir. May 13,

---

[4] The term "swap" should read "sump". *See* **Exhibit A-1.**

2015).  Indirect infringement can be either through inducing or contributing to the infringement by another, but requires specific intent or knowledge.  *Id.* at *5.  To prove indirect infringement, a plaintiff must also prove that there is a direct infringer.  *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 572 U.S. ___, 134 S.Ct. 2111, 2117 (2014).  More specifically, inducing infringement requires that the defendant induced or "possessed the specific intent to encourage another's" direct infringement.  *Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.*, 554 F.3d 1010, 104 (Fed. Cir. 2009) (citing *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (*en banc* in relevant part)).  Contributory infringement requires: 1) direct infringement; 2) the accused infringer had knowledge of the patent; 3) there are no substantial noninfringing uses; and 4) the component is a material part of the invention.  *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).

Reviewing the product literature, website, and online videos[5], FP is directly and indirectly infringing at least Claims 1 and 16 of the '288 Patent.  The claim terms are straightforward terms, and indeed are used by FP in its own literature, and thus no construction of claim terms is needed by the Court.  *See* **Exhibits D-J**.  A claim chart is attached as **Exhibit K** which establishes through FP's admissions on its website, online videos, and in its product literature that every limitation of the two exemplary claims recited above is met.  *See* **Exhibit N-Q**.  FP is performing, and inducing or contributing to the performance of each claimed step or limitation of the patented technology, and therefore FP is infringing at least claim 1 of the '288 Patent.  *See* **Exhibit K.**  Moreover, FP offers a system and/or induces or contributes to the offer of a system that contains each claimed limitation of at least claim 16 of the '288 Patent.  *See* **Exhibit K.**

---

[5] *See e.g.,* http://fpusaoilfield.com/videos/ and https://www.youtube.com/channel/UCAmIZYF4e80uGqyDdsq16AA.

To any extent that FP argues it is not directly infringing claims 1 and 16 of the '288 Patent, FP is indirectly infringing claims 1 and 16 by inducing and/or contributing to the direct infringement by drilling operators on site.  First, FP is inducing infringement by teaching every step of the patented method of claim 1 and the particular combination of the system claim 16. *See e.g.*, **Exhibit D** ("The Vac-Screen System® (VSS) Patented Drilling Fluid Recovery System uses negative pressure to overcome the surface tension of the drilling fluid on the screen….Vac-Screen System® (VSS) relieves surface tension and allows substantially greater recovery of drilling fluid on ANY shaker."); **Exhibit E** ("Depending on the shaker type, a manifold is installed underneath the last shaker screen or affixed onto the end of the shaker.  A hose connected to the manifold provides suction and recovers the drilling fluid lost off of the cuttings as they contact a dry screen….The recovered fluid is held in a containment tank and then automatically discharged back to circulating system in 2 barrel increments.").  FP is aware of the '288 Patent, because in pursuing its own patent on a drilling fluid and drill cuttings separator, FP had to limit its claims and argue around the M-I patent technology as prior art.  *See* **Exhibit L,** *passim* (referring to Carr 2008/0078699).  Also, FP's copying of M-I's patent application disclosure soon after it became public knowledge evidences FP's intent to induce infringement of the '288 Patent.  In addition, FP's supply of a tray and hoses for use with a pressure differential device and for installation under a shaker screen contributes to the infringement of the '288 Patent, because there is no substantial non-infringing use of the tray itself.  **Exhibit E** ("Depending on the shaker type, a manifold is installed underneath the last shaker screen or affixed onto the end of the shaker.  A hose connected to the manifold provides suction and recovers the drilling fluid lost off of the cuttings as they contact a dry screen."); *see Fujitsu Ltd.,* 620 F.3d at 1326; 35 U.S.C. § 271(c).

Based upon FP's own documents it is infringing at least claims 1 and 16 of the '288 Patent, and thus M-I is likely to succeed on the merits of the infringement claim.

    ii.    **Validity**

Patents are presumed valid.  35 U.S.C. § 282.  Indeed, a "patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation."  *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009).  Furthermore, because of this presumption, an alleged infringer who asserts that a patent is invalid must provide invalidity by clear and convincing evidence.  *See, e.g., Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1329 (Fed. Cir. 2008).  Thus to defeat a preliminary injunction based on invalidity a defendant must show that it is "more likely than not that [it] will be able to prove at trial, by clear and convincing evidence, that the patent is invalid."  *Titan Tire*, 566 F.3d at 1379.  Moreover, the alleged infringer cannot merely rehash the prosecution history to challenge validity.  *See Am. Hoist & Derrick Co.,* 725 F.2d at 1359.  As the Federal Circuit explained in *PowerOasis, Inc. v. T-Mobile USA, Inc.*:

> When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.

522 F.3d 1299, 1304 (Fed. Cir. 2008) (quoting *Am. Hoist & Derrick Co.*, 725 F.2d at 1359).  Therefore, to raise a substantial question of validity using any piece of prior art cited or reviewed by the patent examiner during prosecution requires an alleged infringer to overcome two presumptions  *Id*.  The first presumption is that the patent is valid, and the second presumption that the USPTO properly performed its function in reviewing the patent before issuing it.  *Id*.

12

Moreover, the USPTO examined M-I's technology and claims over a total period of eight years, with over two years of that period occurring on the application issuing as the '288 Patent alone. Sixty seven (67) pieces of prior art were reviewed by the examiner. No substantial question of validity can be sustained by FP.

### B.     Irreparable Harm

> Exclusivity is closely related to the fundamental nature of patents as property rights. It is an intangible asset that is part of a company's reputation. . . . Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions.

*Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013). As set forth in the Declaration of Calvin Carter, Business Development Manager, ("Carter Declaration") FP's continued use of the M-I patented technology will result in immediate loss of business to M-I including a loss of market share and market opportunities in the United States where FP has previously operated primarily only under M-I's brands. Carter Declaration, ¶10.

Irreparable harm is often established when the litigants are direct competitors and continued infringement results in loss of market share in a way that cannot be adequately accounted for with money damages. *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-cv-333-TJW, 2006 WL 3741891, at *4 (E.D. Tex. Dec. 19, 2006); *TiVo Inc. v. EchoStar Communications Corp.*, 446 F. Supp. 2d 664, 669-70 (E.D. Tex. 2006) (reversed, in part, on other grounds in 516 F.3d 1290 (Fed. Cir. 2008) (irreparable harm existed because the "availability of infringing products leads to a loss of market share"); *see also O2 Micro International Ltd. v. Beyond Innovation Technology*, No 2-04-CV-32, 2007 WL 869576, at *2 (E.D. Tex. Mar. 21, 2007) (fact of being direct competitors "weighs heavily" in irreparable harm analysis); *Brooktrout Inc. v. Elcon Networks Corp.*, No. 2-03-CV-59, 2007 WL 1730112, at *1

(E.D. Tex. June 14, 2007) (irreparable harm existed where patentee and accused infringer were competitors so infringement caused loss of market share and damages were an inadequate proxy for injunctive relief).  This is especially true in a two-party market, such as is the case here.  *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011) (noting the "the existence of a two-player market may well serve as a substantial ground for granting an injunction—*e.g.*, because it creates an inference that an infringing sale amounts to a lost sale for the patentee"); Carter Declaration, ¶8.  *See Cf. Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir. 1996) ("Years after infringement has begun, it may be impossible to restore a patentee's . . . exclusive position by an award of damages and a permanent injunction . . . . Requiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option."); *see also M/A-COM Tech. Solutions Holdings, Inc. v. Laird Techs., Inc.*, 2014 WL 2727198, at *5 (D. Del. June 13, 2014) (finding irreparable harm where "[plaintiff] has proven that it has had to give price concessions to Ford, which were required at least in large part because of the emergence of a competitor for technology previously sold only by [plaintiff]".)

  FP's continued use of the patented technology will also result in damage to M-I's reputation and goodwill, particularly given the growth stage of the product.  *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930-31 (Fed. Cir. 2012) ("During the growth stage of a product, it is particularly crucial to be able to distinguish oneself from competitors. This includes building the brand, expanding the customer base, and establishing one's reputation and leadership in the market.").  FP's Vac-Screen system utilizes a welded steel tray that has failed in the field.  Carter Declaration, ¶7.  Going forward, these failures, specifically breakage and cracking of the tray, will not be remedied by M-I, and thus the failures of FP's system will be

perceived as failures of the patented technology by drilling operators.  In other words, FP's use of M-I's patented technology includes products known for failing and this will cause harm to the perception in the industry of M-I's patented technology as a whole.  Carter Declaration, ¶7,9.

Finally, if FP is not enjoined there is a likelihood of irreparable harm because FP is unlikely to be able to satisfy a judgment.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,WL 869576, at *2 (E.D. Tex. Mar. 21, 2007), *rev'd on other grounds*, 521 F.3d 1351 (Fed. Cir. 2008) (finding legal remedies inadequate where "defendants are foreign corporations and [] there is little assurance that [plaintiff] could collect monetary damages."); *Bushnell, Inc. v. Brunton Co.*, 673 F. Supp. 2d 1241, 1263 (D. Kan. 2009) ("The Court agrees that the prospect of collecting money damages from a foreign defendant with few to no assets in the United States tips in favor of a finding of irreparable harm."); *Cordelia Lighting, Inc. v. Zhejiang Yankon Grp. Co. Ltd. et al.*, 5:14-cv-00881, Doc. No. 67 at 12, (C.D. Cal. April 27, 2015) (J. Bernal) (holding that difficulty in collecting damages supports a finding of irreparable harm).  The sale or rental of the patented technology, Screen Pulse, and related services by M-I, drives substantial additional revenue in the form of sales of M-I's shale shakers and services, drilling fluid sales, shaker screen sales, rentals of on-site centrifuges, and additional charges for field personnel. Carter Declaration, ¶5.  As such, the damages in terms of both actual damages from infringement and convoyed lost sales could be well above FP's ability to compensate M-I.

Indeed, upon a reasonable investigation, no financials for FP, and specifically its annual revenues, are publicly available.  **Exhibit M**.  Thus, no clarity exists for whether or not FP, as opposed to its related but non-U.S. entities, would have the ability to compensate M-I.  "A district court should assess whether a damage remedy is a meaningful one in light of the financial condition of the infringer before the alternative of money damages can be deemed adequate."

15

*Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011). Here that cannot be determined, and thus weighs in favor of finding irreparable harm. *See also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, No. 204–cv–32, 2007 WL 869576, at *2 (E.D.Tex. Mar. 21, 2007), vacated and remanded on other grounds, 521 F.3d 1351 (Fed. Cir. 2008) (finding that a plaintiff demonstrated the inadequacy of monetary damages because "all three defendants are foreign corporations and that there is little assurance that it could collect monetary damages"). For all these reasons, unless enjoined, M-I will be irreparably harmed and cannot be sufficiently compensated by monetary damages.

### C. Balance of Hardships

The balance of hardships favors M-I. M-I has expended significant time and resources in researching, developing and obtaining a patent, developing the services and market for the patented technology, and building products covered by the patent claims. Daboin Declaration, ¶9. Moreover, granting as injunction will maintain the status quo as M-I and not FP, will continue to furnish the M-I's patented technology to its customers. *Litton Sys.*, 750 F.2d at 961 (the purpose of a preliminary injunction is to maintain the status quo). Furthermore, an injunction is highly unlikely to put FP out of business because of the majority of its business is in Canada and because it has other product lines, but even if an injunction were to have that effect it would still not be improper to issue the injunction. *See Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 708 (Fed. Cir. 1997) (stating that the possibility of being put out of business by a preliminary injunction "does not insulate it from the issuance of a preliminary injunction" and that "[s]mall parties have no special right to infringe patents simply because they are small"). Moreover, the Federal Circuit has consistently held that "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Broadcom Corp. v. Qualcomm, Inc.*,

16

543 F.3d 683, 704 (Fed. Cir. 2008) (quoting *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003, n.12 (Fed. Cir. 1986).  Thus, the balance of hardships favors M-I, because FP should not be rewarded for copying M-I's patented technology after failing to develop a non-infringing method or system of its own.

### D. Public Interest

The public interest favors granting a preliminary injunction in this case, because it is in the public interest to enforce patents to encourage others to invent and utilize the patent system. M-I has properly sought and been granted a patent on the M-I technology and M-I is entitled to the Court's protection of the '288 Patent.  *See* 35 U.S.C. Sec. 271 (whoever utilizes a patent during the patent term without authorization infringes the patent).  Moreover, the public interest will be served by issuing the preliminary injunction requested by M-I, because the "public interest is best served by protecting patent right and enforcing the applicable laws." *MGM Well Servs. v. Mega Lift Sys., LLC*, 505 F. Supp. 2d 359, 380 (S.D. Tex 2007) (citing *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006); *see also Quantun Fitness Corp. v. Quantum Lifestyle Centers, L.L.C.*, 83 F.Supp. 2d 810, 832 (S.D. Tex. 1999) (holding that the "public interest is always served by requiring compliance with Congressional statutes"). Furthermore, the Federal Circuit has consistently held that "absent any other relevant concerns … the public is best served by enforcing patents that are likely valid and infringed." *See, e.g., Abbott Labs. v. Andrx Pharm., Inc.,* 452 F.3d 1331, 1348 (Fed. Cir. 2006).

### IV. CONCLUSION

The facts set out above establish that FP's use of the M-I's patented technology to compete with M-I in the United States is causing irreparable injury to M-I.  Moreover, M-I is likely to succeed on the merits of its claims; the balance of hardships favors enjoining FP's further use of the patented technology; and granting such an injunction will serve the public

interest an promote others to invent and utilize the patent system. Consequently, the requested Preliminary Injunction should be granted, and FP should be enjoined from practicing or performing the method of claim 1, or making, using, selling, or offering for sale equipment covered by claim 16.

DATED: May 21, 2015

Respectfully submitted,

*/s/ John R. Keville*
John R. Keville
Attorney-in-Charge
Texas State Bar No. 00794085
jkeville@winston.com
Michelle C. Replogle *(Pro Hac Vice Pending)*
Texas State Bar No. 24034648
mreplogle@winston.com
WINSTON& STRAWN, LLP
1111 Louisiana, 25TH Floor
Houston, TX  77002
Telephone:  (713) 651-2600
Facsimile:  (713) 651-2700

ATTORNEYS FOR PLAINTIFF,
M-I LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of **PLAINTIFF M-I LLC'S MOTION FOR PRELIMINARY INJUNCTION** is being served on May 22, 2015 on Defendant as follows:

    **By Hand Delivery**:

    FPUSA, LLC
    C/O CT Corporation System
    1999 Bryan Ste. 900
    Dallas, Texas 75201