UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| M-I LLC, | § | No. SA:15–CV–406–DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| FPUSA, LLC, | § | |
| | § | |
| Defendant. | § | |

ORDER GRANTING PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION

        Before the Court is a Motion for Preliminary Injunction filed by

Plaintiff M-I LLC ("Plaintiff").  (Dkt. # 8.)  On June 15, 2015, the Court heard oral

argument on the Motion.  John R. Keville, Esq., appeared at the hearing on behalf

of Plaintiff; Stephen B. Crain, Esq., and Andrew W. Zeve, Esq., appeared at the

hearing on behalf of Defendant FPUSA, LLC ("Defendant").  After reviewing the

Motion and the supporting and opposing memoranda, and considering the parties'

arguments at the hearing, the Court **GRANTS** Plaintiff's Motion for Preliminary

Injunction.  (Dkt. # 8.)

BACKGROUND

        Plaintiff is a limited liability company engaged in the business of

supplying oil drilling fluid and related equipment and services.  (Dkt. # 1 ¶ 1; Dkt.

1

# 8 at 1.)  Drilling fluid serves to lubricate and cool drill bits during the drilling process, and also serves to convey drill cuttings away from the bore hole.  (Dkt. # 8 at 2.)  Drilling fluids are typically very expensive; thus, to reduce the cost of drilling operations, operators seek to recover and reuse as much drilling fluid as possible.  (Id. at 2–3.)  A "shale shaker," which is used to remove large solids from the drilling fluid, is one piece of equipment used in the recovery process.  (Id. at 3.)  Operators feed "slurry" (a mixture of drilling fluid and drill cuttings) onto the shaker bed, where a vibrating screen separates the drilling fluid from drill cuttings and other solids.  (Id.)  The drilling fluid then falls through the screen into a receptacle below.  (Id.)

Plaintiff states that in 2006, its inventor, Brian Carr ("Carr"), filed several patent applications with the United States Patent and Trademark Office ("USPTO") regarding improvements to shakers and the drilling fluid recovery process.  (Id. at 3.)   On April 14, 2015, one of those applications issued as U.S. Patent No. 9,004,288 (the "'288 Patent").  (Id.; Dkt. # 8, Ex. A.)  The abstract of the '288 Patent describes Carr's invention as follows:

> A system for separating components from a slurry of drilling fluid and drill cuttings on a shaker screen having an upper side and a lower side within a shaker.  The system also has a pressure differential generator to pull an effective volume of air through a section of the shaker screen to enhance the flow of drilling fluid through the section of the shaker screen and the separation of drilling fluid from drill cuttings and further maintain an effective flow of drill cuttings off the shaker. A method of separating components of a slurry of drilling fluids and

solids has the steps of delivering the slurry to a shaker, flowing the
slurry over a first screen and applying an effective amount of vacuum
to a first portion of the first screen to remove the drilling fluids from
the slurry without stalling the solids on the first screen.

(Dkt. # 8, Ex. A at 1.)

Figure 4 of the '288 Patent illustrates some of the features of Carr's

invention.  It shows a shaker with multiple screens, and a "sump" (reservoir) under

the screens.  An outlet on the shaker connects to a pressure differential device,

which creates pressure differential across the screens.  The pressure differential

pulls air through the screen, improving drilling fluid recovery as well as the flow of

drill cuttings off the shaker.  (Id. at 4.)   In different iterations of the device, one or

more sumps may be located under the screens such that a pressure differential may

be provided across fewer than all of the shaker screens.  (Id., Ex. A, 7:8–14.)

Adjusting the volume of air pulled through the screens prevents drill cuttings from

stalling as the slurry passes across the screen.  (Id. at 4:49–51.)  Figure 6 of the

'288 Patent illustrates other aspects of Carr's invention.  It shows a screen installed

on top of a sump, which is fluidly connected via flow line to a degassing chamber

and a pressure differential device in order to generate the desired pressure

differential across the screen.  (Dkt. # 8 at 4; id., Ex. A.)

Plaintiff further states that in 2010, FP Marangoni, Inc. ("FPM"),

Defendant's Canadian parent company, approached Plaintiff with a "Vac-Screen

system."  (Dkt. # 8-21 ("Daboin Decl.") ¶ 4.)  Like Carr's invention, the

3

Vac-Screen system generates a pressure differential across shaker screens.  (Dkt. # 8 at 2.)  Because Plaintiff had not yet developed its own product embodying the '288 Patent, Plaintiff rented the drop-in trays of the Vac-Screen system from FPM. (Daboin Decl. ¶ 4.)  Plaintiff began offering those drop-in trays with its own pressure differential technology in the United States market, and branded the product as Plaintiff's "MAXIMIZER."  (Id. ¶ 5.)

Eventually, Plaintiff states that it became clear that Defendant, which is an American subsidiary of FPM, intended to market its Vac-Screen system in the United States in direct competition with Plaintiff's MAXIMIZER.  (Id. ¶ 7; Dkt. # 8-20 ("Carter Decl.") ¶ 6.)  Plaintiff consequently focused on completing the commercialization of the '288 Patent technology, called the "Screen Pulse system."  (Daboin Decl. ¶ 8.)  Screen Pulse is a "simple retrofit installation" for Plaintiff's existing Meerkat and Mongoose series shakers.  (Dkt. # 8 at 5; id., Ex. C.)  An outlet connected to the sump, installed below the last shaker screen, is fluidly connected to a pressure differential device.  The Screen Pulse creates suction, which pulls residual drilling fluid from the cuttings as the shaker processes the slurry.  (Dkt. # 8 at 6; id., Ex. C.)

Defendant presents the Court with additional factual background information.  Defendant states that FPM first installed its Vac-Screen system in 2010, and that the system was commercially successful.  (Dkt. # 22, Ex. 2 ("Bruce

Decl.") ¶ 4.)   In the same year, it filed a patent application on the Vac-Screen technology, and on April 28, 2015, the United States Patent Office issued U.S. Patent No. 9,015,959 (the "'959 Patent") to FPM as assignee.  (Bruce Decl. ¶ 4; Dkt. # 22, Ex. 10.)  The Vac-Screen system consists of a tray attached either to the end of a shaker or under the last screen.  (Dkt. # 22, Ex. 1 ("Matthews Decl.") ¶¶ 52–54; Bruce Decl. ¶ 3.)  It applies a vacuum to improve recovery of the remaining slurry.  (Matthews Decl. ¶ 52–54; Bruce Decl. ¶ 3.)  Importantly, the Vac-Screen system only applies vacuum pressure to the last screen.  (Matthews Decl. ¶ 54; Bruce Decl. ¶ 3.)

Defendant further states that on October 9, 2010, Plaintiff and FPM entered into a non-disclosure agreement for the purpose of allowing Plaintiff to evaluate the Vac-Screen technology.  (Dkt. # 22, Ex. 5.)  Although Plaintiff tested the product, it did not license or otherwise market it at that time.  (Bruce Decl. ¶ 6.)  Defendant continued to commercialize the system, and in July 2012, Plaintiff and FPM entered into a second non-disclosure agreement "to discuss a potential business relationship . . . for possible future rentals."  (Dkt. # 22, Ex. 6.)  Plaintiff agreed to provide FPM with access to its customer base, and FPM agreed to provide Plaintiff with the Vac-Screen technology.  (Bruce Decl. ¶¶ 7–10.)

Later that same year, Plaintiff and FPM entered into another agreement to facilitate Plaintiff's deployment of the Vac-Screen system to its

5

customers and to share revenues generated from system rentals.[1]  (Id. ¶ 8; Dkt. # 22, Ex. 3 ("Jackson Decl.") ¶ 5.)  Defendant states that the relationship was a success, and on August 1, 2013, Plaintiff and FPM entered into a confidentiality agreement "in connection with . . . a possible acquisition of [FPM] by [Plaintiff]." (Dkt. # 22, Ex. 7.)  Plaintiff offered to buy FPM, but in November 2013, FPM rejected Plaintiff's offer.  (Id., Ex. 4 ("Russell Decl.") ¶ 6.)  Defendant claims that while the parties negotiated the potential purchase, Plaintiff developed a back-up plan "to force [Defendant] out of the market," (Dkt. # 22 at 4), and on April 16, 2015, two days after the '288 Patent issued, Plaintiff terminated its agreement with FPM.  (Russell Decl. ¶ 6.)

On May 15, 2015, Plaintiff filed a Complaint against Defendant in this Court alleging one count of patent infringement.  (Dkt. # 1.)  Specifically, Plaintiff claims that the Vac-Screen system is covered by one or more claims of the '288 Patent, and that Defendant directly infringes the '288 Patent by making, using, renting, selling, or offering to rent or sell the Vac-Screen system in the United States.  (Id. ¶¶ 14–15.)  Plaintiff further alleges that Defendant induces others to infringe the '288 Patent and contributes to the infringement of the

---

[1] Plaintiff and FPM agreed to split revenue on a 60/40 basis.  If Plaintiff provided the vacuum, Plaintiff paid FPM 40% of the revenue generated.  If FPM provided the vacuum, Plaintiff paid FPM 60% of the revenue.  (Bruce Decl. ¶ 8.)

'288 Patent by making, using, renting, selling, or offering to rent or sell the Vac-Screen system in the United States.  (<u>Id.</u> ¶ 16.)

On May 21, 2015, Plaintiff filed the instant Motion for Preliminary Injunction seeking to prevent Defendant from bringing the Vac-Screen system into the United States market, which Plaintiff argues would violate its patent rights. (Dkt. # 8.)  On May 22, 2015, the Court entered an Order scheduling a hearing on the matter and setting a briefing schedule for the parties.  (Dkt. # 10.)  On May 28, 2015, after retaining counsel, Defendant filed an Emergency Motion to Continue the hearing and the briefing schedule.  (Dkt. # 13.)  The Court granted Defendant an extension of one week, and Defendant timely filed its Response on June 5, 2015.  (Dkt. # 15.)  On June 10, 2015, Plaintiff filed a Reply.  (Dkt. # 16.)  On June 18, 2015, Defendant filed a Notice of New Controlling Authority.  (Dkt. # 29.)  On June 22, 2015, Plaintiff filed a Response to Defendant's Notice.  (Dkt. # 30.)

<u>LEGAL STANDARD</u>

A patentee suing an alleged infringer for patent infringement may, for the purpose of immediately preventing further alleged infringement, move for the "extraordinary relief" of a preliminary injunction.  35 U.S.C. § 283; <u>Titan Tire Corp. v. Case New Holland, Inc.</u>, 566 F.3d 1372, 1375 (Fed. Cir. 2009).  The purpose of a preliminary injunction is "to preserve the status quo pending a

determination of the action on the merits." <u>Litton Sys., Inc. v. Sundstrand Corp.</u>, 750 F.2d 952, 961 (Fed. Cir. 1984).  A party seeking a preliminary injunction must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of relief, (3) that the balance of equities is in its favor, and (4) that an injunction is in the public interest.  <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008).

Because the grant of a preliminary injunction is not unique to patent law, the Federal Circuit applies the law of the regional circuit when reviewing and interpreting such decisions.  <u>Aevoe Corp. v. AE Tech. Co.</u>, 727 F.3d 1375, 1381 (Fed. Cir. 2013).  However, "[s]ubstantive matters of patent infringement are unique to patent law, and thus the estimated likelihood of success in establishing infringement is governed by Federal Circuit law."  <u>Revision Military, Inc. v. Balboa Mfg. Co.</u>, 700 F.3d 524, 526 (Fed. Cir. 2012).

DISCUSSION

I.    <u>Likelihood of Success on the Merits</u>

A party seeking a preliminary injunction must first show a likelihood of success on the merits.  <u>Winter</u>, 555 U.S. at 20.  For a patentee-plaintiff to establish that it is likely to succeed on the merits of a patent infringement claim, it must show (1) that it is likely to prove infringement of the patent claim, and (2) that the infringed-upon claim is valid.  <u>AstraZeneca LP v. Apotex, Inc.</u>, 633

8

F.3d 1042, 1050 (Fed. Cir. 2010).  To meet its burden under this prong, a patentee must prove that "success in establishing infringement is more likely than not." Trebro Mfg., Inc. v. Firefly Equip., LLC, 748 F.3d 1159, 1166 (Fed. Cir. 2014) (internal quotation marks omitted).  "A preliminary injunction should not issue if an alleged infringer raises a substantial question regarding either infringement or validity." AstraZeneca, 633 F.3d at 1050.  The Court addresses the infringement and validity elements in turn below.

A.      Infringement

To establish infringement, Plaintiff must show that the allegedly infringing product or method meets each limitation of the '288 Patent claims, either literally or under the doctrine of equivalents.  Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1272 (Fed. Cir. 2004).  Courts engage in a two-step analysis in determining whether a claim has been infringed: "First, the claim must be properly construed to determine its scope and meaning.  Second, the claim as properly construed must be compared to the accused device or process." Carroll Touch, Inc. v. Electro Mech. Sys., Inc., 15 F.3d 1573, 1576 (Fed. Cir. 1993).

Plaintiff claims that Defendant directly and indirectly infringes Claims 1 and 16 of the '288 Patent.  (Dkt. # 8 at 10.)  To establish direct infringement, Plaintiff must show that Defendant performed or used each and every element of

9

the claimed method.  <u>Akamai Techs., Inc. v. Limelight Networks, Inc.</u>, —F.3d—,

Nos. 2009-1372, 2009-1417, 2009-1380, 2009-1416, 2015 WL 2216261, at *1

(Fed. Cir. May 13, 2015).

Claim 1 is a claim to a method of processing drilling fluid and drilled

cuttings, while Claim 16 is a claim to the equipment used to carry out the method.

(<u>Id.</u>)  Claim 1 reads as follows:

> 1.  A method comprising:
> introducing a slurry to a shaker having a first screen and a second
>     screen;
> flowing the shiny[2] [sic] over the first screen;
> applying a first pressure differential to the first screen and not
>     applying the first pressure differential across the second screen;
>     and
> controlling air flow under at least a portion of the first screen to
>     prevent stalling of the slurry on the screen.

(Dkt. # 8, Ex. A, 11:43–51.)  Claim 16 reads as follows:

> 16.  A system comprising:
> a first screen having an upper side and a lower side for separating drill
>     cuttings and drilling fluid within a shaker;
> a pressure differential generator configured to pull air or vapor through the
>     first screen to enhance the flow of drilling fluid through the first screen
>     with respect to a second screen within the shaker in which the pressure
>     differential generator does not create a pressure differential between an
>     area above and an area below the second screen; and
> a sump located below the first screen and configured to collect the air or
>     vapor and the drilling fluid that passes through the first screen; and

---

[2] "Shiny" should read "slurry."  On April 30, 2015, a certificate of correction was
filed for the '288 Patent, correcting this typographical error as well as the error
noted in footnote 3 below.  (Dkt. # 8 at 8 n.3; <u>id.</u>, Ex. A-1.)

a degassing chamber in fluid communication with the pressure differential generator and the swap[3] [sic] and located external to the shaker for collecting all of the air or vapor and the drilling fluid in the sump and removing air or vapor from the drilling fluid.

(Id., 12:47–65.)

Defendant argues that the Vac-Screen system cannot infringe on the '288 Patent for four reasons.  First, Plaintiff's technology involves applying a pressure differential to the <u>first</u> screen, whereas Defendant's system applies a vacuum to the <u>last</u> screen in a shaker.  (Dkt. # 22 at 7.)  Second, the Vac-Screen system does not "control air flow" as required by Claim 1.  (Id. at 11.)  Third, the Vac-Screen system does not perform the method of Claim 1.  (Id. at 10.)  Finally, the Vac-Screen system does not contain a "degasser" as required by Claim 16.  (Id. at 12.)

### 1.    "First" Screen Limitation

Defendant first argues that the Vac-Screen system cannot infringe on the '288 Patent because Plaintiff's technology involves applying a pressure differential to the first screen nearest a shaker's inlet, whereas Defendant's system applies a vacuum to the last screen nearest the outlet.  (Dkt. # 22 at 7.)  The first step in the Court's infringement analysis is to properly construe the claim to determine its scope and meaning.  <u>Carroll Touch, Inc.</u>, 15 F.3d at 1576.  Defendant argues that Plaintiff asks the Court to construe the word "first" to mean "last"

---

[3] "Swap" should read "sump."  (Dkt. # 8 at 9 n.4; <u>id.</u>, Ex. A-1.)

when comparing the shaker screens of the Screen Pulse and Vac-Screen systems. (Dkt # 22 at 6.)  As seen above, both Claims 1 and 16 of the '288 Patent make repeated reference to a pressure differential applied to a "first screen."  (See Dkt. # 8, Ex. A) (emphasis added).  In contrast, Defendant states that the Vac-Screen system applies a vacuum only to the last screen.  (Dkt. # 22 at 8; Matthews Decl. ¶ 54; Bruce Decl. ¶ 3.)

      Federal Circuit law holds that claim terms are generally given their ordinary meaning.  In re Papist Licensing Digital Camera Patent Litig., 778 F.3d 1255, 1261 (Fed. Cir. 2015).  In determining a term's "ordinary meaning," courts look to the context of the claim and the whole patent document.  Id.  Even if a term's meaning is "plain on the fact of the claim language, the patentee can, by acting with sufficient clarity, disclaim such a plain meaning or prescribe a special definition."  Id. (quoting World Class Tech Corp. v. Ormco Corp., 769 F.3d 1120, 1123 (Fed. Cir. 2014)).  Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  Id. (quoting Reinshaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)) (alteration in the original).  When construing a claim, courts look to the patent specification as the "primary basis" for the analysis.  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

Contrary to Defendant's assertions, the '288 Patent does not indicate that it covers only configurations in which the pressure differential is applied to the screen closest to the shaker's inlet.  The specification states:

> For example, where separator **60** has four screens in series, sump **50A** may be located proximate inlet **52** under the first two screens.  Sump **50B** may be located proximate outlet **54B**, under the last two screens (where first and last corresponds to the direction of flow from inlet **52** to outlet **54B**).  Sump **50A** may thus create an independent zone from sump **50B**, allowing for operations of the two zones at the same or different pressure differentials.  <u>One or more devices may be provided to create a pressure differential across either or both sets of screens.</u>  <u>The pressure differential across the screens in either zone may be manipulated . . . .</u>

(Dkt. # 8, Ex. A, 7:21–31) (emphasis added).  While Defendant points to the language in parentheticals, indicating that "first" and "last" correspond to the direction of flow from inlet to outlet, the underlined language alone makes clear that the pressure differential may be applied to any screen.  In another instance, the specification states that, "[o]ne or more sumps may be located under the screens such that a pressure differential may be provided across less than all of the two or more screens."  (<u>Id.</u> at 7:10–13.)  Again, this language indicates that the pressure differential may be applied to any screen—not just the screen closest to the inlet.

Additionally, the Federal Circuit has noted that "[t]he use of the terms 'first' and 'second' is a common patent-law convention to distinguish between repeated instances of an element or limitation."  <u>3M Innovating Props. Co. v. Avery Dennison Corp.</u>, 350 F.3d 1365, 1371 (Fed. Cir. 2003).  As such, the terms

13

do not denote spatial location.  <u>Free Motion Fitness, Inc. v. Cybex Intern., Inc.</u>, 423 F.3d 1343, 1348 (Fed. Cir. 2005).  The Court thus construes the terms "first" and "second" to distinguish between repeated instances of an element or limitation, and does not construe them to denote spatial location relative to the shaker's inlet.

The second step in the Court's analysis is to compare the claim as properly construed to the accused device or process.  <u>Carroll Touch, Inc.</u>, 15 F.3d at 1576.  Again, both Claim 1 and Claim 16 of the '288 Patent make repeated reference to a "first screen" to which a pressure differential is applied.  (Dkt. # 8, Ex. A, 11:43–51; 12:47–65).  Plaintiff argues that the Vac-Screen system also performs this step, and points to Defendant's own website and promotional video as evidence.  (Dkt. # 8, Ex. K.)  Defendant counters that the Vac-Screen system applies a vacuum to the last screen on the shaker, rather than the first.  (Dkt. # 22 at 4; Matthews Decl. ¶¶ 54, 58; Bruce Decl. ¶ 3.)

However, Defendant's argument is premised on an incorrect construction of the claim terms—as explained above, "first" and "second" do not reference the sequential order of the screens.  Applying the Court's construction of the term "first" to Claims 1 and 16, the Vac-Screen system infringes these claims if it applies a pressure differential to one of multiple screens in a shaker.  Defendant affirmatively states that the Vac-Screen system contains a tray and vacuum below the last screen in a shaker, (Dkt. # 22 at 4; Matthews Decl. ¶¶ 54, 58; Bruce Decl.

¶ 3), and Plaintiff's evidence corroborates this statement.  (Dkt. # 8, Ex. E.)
Because the Vac-Screen system creates a pressure differential across one of
multiple screens in a shaker, the Court finds that the Vac-Screen system satisfies
the "first screen" limitation of Claims 1 and 16.

### 2.    "Control Air Flow" Limitation

Defendant next argues the Vac-Screen system does not "control air
flow" as required by Claim 1.  (Dkt. # 22 at 11.)  The Court begins its analysis by
construing the claim term "control[ling] air flow."  See Carroll Touch, Inc., 15
F.3d at 1576.  Defendant argues that the claim "control[ling] air flow under at least
a portion of the first screen to prevent the stalling of slurry on the screen" is a
"step-plus-function" claim that must be construed pursuant to 35 U.S.C. § 112 ¶ 6.
(Dkt. # 22 at 11.)  Defendant argues that when properly construed, this limitation
requires "the acts of pulsing, toggling, or intermittently interrupting the pressure
differential to accomplish the stated function 'to prevent stalling.'"  (Id.)

A patent applicant may express an element of a claim "as a means or
step for performing a specified function . . . and such claim shall be construed to
cover the corresponding structure . . .  described in the specification and
equivalents thereof."  35 U.S.C. § 112(f).  This statute permits "an element in a
combination method or process claim [to] be recited as a step for performing a
specified function without the recital of acts in support of the function."  O.I. Corp.

v. Tekmar Co., Inc., 115 F.3d 1576, 1583 (Fed Cir. 1997.)  "The price that must be paid for use of that convenience is limitation of the claim to the [acts] specified in the written description and equivalents thereof."  See id.  "[I]n the context of method claims, the use of the term 'steps for' signals the drafter's intent to invoke § 112, paragraph 6."  Masco Corp v. United States, 303 F.3d 1316, 1326 (Fed. Cir. 2002).  In the absence of the "steps for" language, "a limitation of that claim cannot be construed as a step-plus-function limitation without a showing that the limitation contains no act."  Id. at 1327.

Step-plus-function claims are closely related to means-plus-function claims, which refer to apparatus claims.  The Federal Circuit "has rarely examined step-plus-function claim elements; however, the language of § 112 ¶ 6 and ... [the Federal Circuit's] means-plus-function case law give guidance for determining whether a claim element is in step-plus-function form so as to invoke the statute's claim interpretation requirements."  Seal-Flex, Inc. v. Athletic Track & Court Constr., 172 F.3d 836, 848 (Fed. Cir. 1999) (Rader, J., concurring). "The statute's format and language suggest a strong correlation between means and step-plus-function claim elements in both their identification and interpretation."  Id.

With respect to means-plus-function claims, Federal Circuit law holds that "[a] claim limitation that actually uses the word 'means' invokes a rebuttable presumption that § 112 ¶ 6 applies.  By contrast, a claim term that does not use

16

'means' will trigger the rebuttable presumption that § 112 ¶ 6 does not apply."
CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1358 (Fed. Cir. 2004).  The
presumption flowing from the absence of the word "means" was "a strong one that
[was] not readily overcome."  Lighting World, Inc. v. Birchwood Lighting, Inc.,
382 F.3d 1354, 1358 (Fed. Cir. 2004).  Put otherwise, the Federal Circuit was
unwilling to apply § 112 ¶ 6 "without a showing that the limitation essentially is
devoid of anything that can be construed as structure."  Flo Healthcare Solutions,
LLC v. Kappos, 697 F.3d 1367, 1374 (Fed. Cir. 2012).

On June 16, 2015, the Federal Circuit overruled a portion of its
previous line of precedent regarding means-plus-function claims.  Williamson v.
Citrix Online, LLC, —F.3d—, No. 2013 1130, 2015 WL 3687459, at *7 (Fed. Cir.
June 16, 2015).  Specifically, the Federal Circuit no longer characterizes the
presumption that a limitation without the word "means" is not subject to § 112 ¶ 6
as "strong."  Id.  It also overruled the requirement of "a showing that the limitation
essentially is devoid of anything that can be construed as structure."  Id.  Rather,
"[t]he standard is whether the words of the claim are understood by persons of
ordinary skill in the art to have a sufficiently definite meaning as the name for
structure."  Id.  A claim lacking the word "means" will be construed pursuant to
§ 112 ¶ 6 "if the challenger demonstrates that the claim term fails to recite
sufficiently definite structure or else recites function without reciting sufficient

structure for performing that function."  Id. (citing Watts v. XL Sys., Inc., 232 F.3d

877, 880 (Fed. Cir. 2000) (internal quotation marks omitted).

The Federal Circuit did not specify how, if at all, Williamson altered

the law regarding step-plus-function claims.  The Court need not decide that issue,

however, because even if Defendant could overcome the presumption that Claim 1

does not include a step-plus-function claim, the Vac-Screen system still likely

infringes.  If the Court interprets the claim "controlling air flow under at least a

portion of the first screen to prevent stalling of the slurry on the screen" as a

step-plus-function claim, as Defendant suggests, then the Court would construe the

claim to include only those acts "to control air flow" that are expressly recited in

the patent specification.  See O.I. Corp., 115 F.3d at 1583.  Defendant argues that

in that situation, "controlling air flow" can only mean "deliberate pulsation of the

vacuum force applied to the first screen."  (Dkt. # 29 at 2.)  However, the '288

Patent also anticipates "applying an effective amount of vacuum to a first portion

of the first screen to remove the drilling fluids from the slurry without stalling the

solids on the first screen."  (Dkt. # 8, Ex. A, 4:21–25.)  Plaintiff's evidence shows

that the Vac-Screen system applies a vacuum to one of multiple screens in a

shaker: it uses "negative air pressure (suction) to capture drilling fluid that is

adhering to larger drilled cuttings."  (Dkt. # 24, Ex. S at 5.)  The Vac-Screen

system therefore likely performs this step of Claim 1.

3.    <u>Method of Claim 1</u>

Third, Defendant states that Plaintiff cannot point to any evidence that

Defendant performs any of the steps of Claim 1.  (Dkt. # 22 at 10.)  Claim 1

includes the following four steps:

> 1.1    Introducing a slurry to a shaker having a first screen and a
>           second screen;
> 1.2    Flowing the slurry over the first screen;
> 1.3    Applying a first pressure differential to the first screen and not
>           applying the first pressure differential across the second screen; and
> 1.4    Controlling air flow under at least a portion of the first screen to
>           prevent the stalling of the slurry on the first screen.

(Dkt. # 8, Ex. A, 11:44–51.)  In the above sections of this Order, the Court has

already found that Plaintiff has shown a likelihood that Defendant's system

performs steps 1.1 and 1.4 of Claim 1.  Thus, the Court limits its discussion to

steps 1.2 and 1.3.

Step 1.2 of Claim 1 anticipates slurry flowing over the "first" screen

in a shaker to which a pressure differential is applied.  Defendant argues that the

Vac-Screen system does not perform step 1.2 of Claim 1 because "slurry

introduced at the input end of the shaker is depleted of drilling fluid before

reaching the last shaker screen, leaving only wet drill cuttings having residual

drilling fluid adhered thereto to pass over the last screen having the [Vac-Screen]

system."  (Matthews Decl. ¶ 58.)  In other words, Defendant appears to have

abandoned its position that the "first" screen is the screen closest to the shaker's

19

inlet, and argues that the substance flowing over the screen having the Vac-Screen system is no longer "slurry" but rather consists only of "wet drill cuttings."

The '288 Patent repeatedly states that the embodiments disclosed therein "relate to a method for separating components of a slurry."  (See, e.g., Dkt. # 8, Ex. A, 5:19–20.)  The '288 Patent defines "slurry" as "a mixture of drilling fluid and drill cuttings."  (Id., 5:20–21.)  Likewise, the invention disclosed in Defendant's patent relates to "separating drilling fluid from drill cuttings."  (Dkt. # 22, Ex. 10, 4:24–25.)  Defendant's argument, then, is essentially one of degree— it argues that the mixture of drilling fluid and drill cuttings that flows over the screen having the Vac-Screen system no longer contains enough drilling fluid to be considered "slurry."  Ultimately, the Court determines that it need not decide whether the Vac-Screen system performs this step of Claim 1.  In order to show a likelihood of success on the merits, a plaintiff must only show that it will likely prove the defendant "infringes at least one valid and enforceable patent claim."  Abbott Labs. v. Andrx Pharm., Inc., 473 F.3d 1196, 1201 (Fed. Cir. 2007).  For the reasons explained below, Plaintiff has met its burden with respect to Claim 16.

4.   Degasser

Finally, Defendant argues that Plaintiff cannot demonstrate a likelihood of success on the merits with respect to Claim 16 because the Vac-Screen system does not include a "degassing chamber" as required by Claim

16. (Dkt. # 22 at 12.)  According to Defendant, a "degassing chamber is specialized equipment with known function and meaning within the field of drilling recovery fluid." (Matthews Decl. ¶ 20.)  The '288 Patent states that drilling fluid is "degass[ed] to remove remaining entrained gases. Degassing the drilling fluid may be performed by any method known in the art." (Dkt. # 22, Ex. 8, 11:7–9.)  In other words, according to Plaintiff, a degassing chamber is a tank that separates drilling fluid from gases entrained in the fluid. (Dkt. # 24 at 6–7.)

Plaintiff points out that the '959 Patent describes two "accumulator tanks" providing "fluid/gas separation." (Dkt. # 22, Ex. 10, 8:61–64.) Furthermore, Defendant's own Technology Evaluation Report of the Vac-Screen system stated that "[a]ttached to the manifold is a vacuum line with a fluid or air separator." (Dkt. # 24, Ex. S at 6.)  The Court therefore finds the Vac-Screen system includes a system by which the drilling fluid is separated from residual air or gas, as stated in Claim 16.  For the foregoing reasons, the Court finds that Plaintiff has met its burden of showing a likelihood of the success of the merits on its direct infringement claim with respect to Claim 16.

B.    Validity

"Even if a patentee shows it will likely prove infringement, the accused infringer can defeat the likelihood of success on the merits by raising a

substantial question as to the validity of the patent in suit." <u>Wavetronix LLC v. Iteris, Inc.</u>, No. A-14-CA-970-SS, 2015 WL 300726, at *6 (W.D. Tex. Jan. 22, 2014) (citing <u>Trebro</u>, 748 F.3d at 1169).  At the preliminary injunction stage, the burden of raising a substantial question of validity rests with the party attacking validity, while the party seeking the injunction bears the burden of showing "a reasonable likelihood that the attack on its patent's validity would fail." <u>Oakley, Inc. v. Sunglass Hut Intern.</u>, 316 F.3d 1331, 1339–40 (Fed. Cir. 2003) (internal quotation marks omitted).

There is a statutory presumption that issued patents are valid. 35 U.S.C. § 282.  However, Defendant argues that there is a substantial question as to the validity of the '288 Patent because it was anticipated by prior art.  (Dkt. # 22 at 15.)  Specifically, Defendant raises an on-sale bar defense pursuant to 35 U.S.C. § 102(b), which provides that a claim is invalid if "the invention . . . was on sale in this country more than a year prior to the date of application for patent in the United States."  Defendant contends that because its Vac-Screen system has been on sale in the United States since 2010, Plaintiff's patent, which Defendant states has an application date of 2013, is invalid.  (<u>Id.</u>)  The on-sale bar invalidates a patent when "there was a definite sale or offer for sale of the claimed invention prior to the critical date, defined as one year prior to the U.S. filing date to which the application was entitled." <u>Linear Tech. Corp. v. Micrel, Inc.</u>, 275 F.3d 1040,

1047 (Fed. Cir. 2001) (quoting Mas–Hamilton Grp., Inc. v. LaGard, Inc., 156 F.3d 1206, 1216 (Fed. Cir. 1998)) (internal quotation marks omitted).

The critical issue in this case is the application date to which the '288 Patent is entitled (the "priority date"). The '288 Patent issued from an application filed on March 18, 2013. (Dkt. # 8, Ex. A.) However, Plaintiff argues that the '288 Patent is entitled to an earlier priority date because it is a continuation of another patent (the "'360 Patent") which issued from an application filed on September 29, 2006. (Dkt. # 24 at 12.) Defendant disagrees, and contends that the '288 Patent is not a continuation of the earlier patent. (Dkt. # 22 at 15.) "To obtain the benefit of the filing date of a parent application, the claims of the later-filed application must be supported by the written description in the parent 'in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought.'" Anascape, Ltd. v. Nintendo of Am. Inc., 601 F.3d 1333, 1335 (Fed. Cir. 2010) (quoting Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1572 (Fed. Cir. 1997)).

Defendant argues that the '288 Patent is not entitled to the earlier priority date because the '288 Patent contains seven additional paragraphs of text not included in the specification of the '360 Patent. (Dkt. # 22 at 16.) According to Defendant, this newly added material is necessary to support the new claims in the '288 Patent. (Id.) First, Defendant points out that Claim 1 includes an element

of "controlling air flow under at least a portion of the first screen," and contends

that the written description supporting this claim element appears for the first time

in new text of the '288 Patent.  (Id.)  Plaintiff responds that the 2006 application

supports this limitation.  Paragraph 27 of the 2006 application states:

> A pressure differential device (not shown) may be provided to create a
> pressure differential between the vapor space above screen 42 and the
> vapor space between 42 and sump 50 . . . . Whether internal or
> external to sump 50, the pressure differential device may cause vapor
> to flow from the vapor space between screen 42 and sump 50 to a
> point external to sump 50 . . .

(Dkt. # 24, Ex. W ¶ 27.)  The application further states that "[i]n some

embodiments, the pressure differential may be pulsed, toggled, or intermittently

interrupted.  Toggling or pulsing of the pressure differential, as used herein, refers

to changing of the pressure differential from static (a zero pressure differential

across the screen) to at least a partial vacuum below the screen."  (Id. ¶ 30.)  This

language clearly anticipates manipulating or controlling the air ("vapor space")

below screens in the shaker, as claimed in the '288 Patent.

Second, Defendant points out that Claim 16 requires "a first screen

having an upper side and a lower side for separating drill cuttings and drilling fluid

within a shaker," and argues that the only written description of this element is in

the new text of the '288 Patent.  (Dkt. # 22 at 16.)  Plaintiff again argues that the

2006 application supports this limitation.  (Dkt. # 24 at 14.)  Paragraphs 22 and 24

of the 2006 application state:

24

> [E]mbodiments disclosed herein relate to a method for separating
> components of a slurry . . . . A slurry may be separated using a screen
> separator having a pressure differential across the screen . . . . A sump
> 50 is located below the screen mounting to receive material passed
> through the screen 42 . . . . Material not passing through screen 42 is
> discharged off the end of the screen 42 and suitably collected.

(Dkt. # 24, Ex. W ¶¶ 22, 24.)  The Court finds that this language anticipates slurry being deposited on the upper side of a screen, drilling fluid passing through the screen, and drilled cuttings remaining on the upper side of the screen for collection.

Where a party challenging an injunction raises a question as to the validity of a patent, the party seeking an injunction need only show "a reasonable likelihood that the attack on its patent's validity would fail." Oakley, Inc., 316 F.3d at 1339–40.  The Court finds that Plaintiff has met its burden of showing a reasonable likelihood that the 2006 application supports Claims 1 and 16 of the '288 Patent, and that the '288 Patent is entitled to a priority date of September 29, 2006.  Because the Vac-Screen system was not on sale prior to that date, Defendant has failed to raise a substantial question as to the validity of the '288 Patent.

## II.   Irreparable Harm

Next, a plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction." Winter, 555 U.S. at 22.  In the patent infringement context, a patentee-plaintiff must establish both

25

irreparable harm and a "sufficiently strong causal nexus" between that harm and the alleged infringement.  Apple Inc. v. Samsung Elecs. Co., 695 F.3d 1370, 1374 (Fed. Cir. 2012).   "[T]he central inquiry in deciding whether there is a substantial threat of irreparable harm to the plaintiff is whether the plaintiff's injury could be compensated by money damages."  Allied Mktg. Grp., Inc. v. CDL Mktg., Inc., 878 F.2d 806, 810 n.1 (5th Cir. 1989).

Plaintiff alleges that it will suffer irreparable harm in the absence of an injunction because (1) Defendant's continued infringement would result in loss of market share and damage to Plaintiff's reputation and goodwill, and (2) Defendant is unlikely to be able to satisfy a judgment.  (Dkt. # 8 at 15.)  "Price erosion, loss of goodwill, damages to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."  Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012).  Here, the parties do not dispute that they are each other's sole competitors in the relevant market.  "Direct competition in a two-supplier market does suggest the potential for irreparable harm flowing from infringement, as 'it creates an inference that an infringing sale amounts to a lost sale for the patentee[.]'"  Wavetronix LLC v. Iteris, Inc., No. A-14-CA-970-SS, 2015 WL 300726, at *7 (W.D. Tex. Jan. 22, 2015) (quoting Robert Bosch LLC v. Pylor Mfg. Corp., 659 F.3d 1142, 1151 (Fed. Cir. 2011)).  The

26

Court thus finds that the potential loss of market share weighs in favor of finding irreparable harm.

Plaintiff also argues that in the absence of an injunction, it will suffer irreparable harm to its reputation and goodwill because the Vac-Screen system's trays are known to fail, and this will damage the industry's perception of Plaintiff's patented technology.  (Dkt. # 8 at 14; Carter Decl. ¶¶ 7, 9.)  As evidence of the failures, Plaintiff submits several failure reports.  (Dkt. # 24-10.)  However, throughout the course of its business relationship with Defendant, Plaintiff did not choose to stop using Defendant's product, although Plaintiff asserts that "tray failures have been an ongoing issue since the beginning."  (Dkt. # 24 at 17.)  Instead, Plaintiff chose to "get[] together with [Defendant], to see if we can find a way to reduce failure rates."  (Carter Decl. ¶ 15.)  Plaintiff cannot argue that an injunction is needed to prevent harm that Plaintiff itself did not do everything in its power to prevent.

Finally, Plaintiff argues that Defendant is unlikely to be able to satisfy a judgment because Defendant's financials are not publicly available, and Plaintiff's damages could be well above Defendant's ability to compensate Plaintiff.  (Dkt. # 8 at 15.)  While it is true that "[a] district court should assess whether a damage remedy is a meaningful one in light of the financial condition of the infringer before the alternative of money damages can be deemed adequate,"

27

Robert Bosch, 659 F.3d at 1155, the Federal Circuit has suggested that a plaintiff

must produce at least some type of evidence of the defendant's financial condition,

even in the absence of opportunity to conduct discovery.  Id.

However, Defendant is a small subsidiary of a foreign corporation,

and district courts have often found that money damages are insufficient in cases

involving foreign infringers.  See Aevoe Corp. v. Shenzhen Membrane Precise

Electron Ltd., No. 2:12-CV-00054-GMN, 2012 WL 1532308, at *6 (D. Nev. May

1, 2012) ("the Court is persuaded that it may be difficult or impossible to collect on

a money judgment because Defendant currently is a foreign entity and this alone is

sufficient to show that [Plaintiff] will likely be irreparably harmed"); Bushnell, Inc.

v. Brunton Co., 673 F. Supp. 2d 1241, 1263 (D. Kan. 2009) ("the prospect of

collecting money damages from a foreign defendant with few to no assets in the

United States tips in favor of a finding of irreparable harm"); Canon Inc. v. GCC

Int'l Ltd., 450 F. Supp. 2d 243, 255–56 (S.D.N.Y. 2006) (granting preliminary

injunction where defendant was largely based abroad).  After considering all of the

arguments presented, the Court finds that Plaintiff has shown that it will likely be

irreparably harmed if an injunction is not granted.

III.   Balance of Equities

Third, a plaintiff seeking a preliminary injunction must show that the

balance of equities weighs in its favor.  "The district court must balance the harm

that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1457 (Fed. Cir. 1988).  A court may issue a preliminary injunction if, after balancing the parties' respective interests, "neither party has a clear advantage."  Id. at 1457–58.

      Plaintiff argues the balance of hardships weighs in favor of granting an injunction, because an injunction would maintain the status quo: Plaintiff would continue to furnish its patented technology to customers.  (Id.)  Defendant responds that an injunction would drastically alter the status quo, because it has been selling its Vac-Screen system to customers in the United States for years before this suit was filed.  (Dkt. # 22 at 20.)  In the preliminary injunction context, an injunction "preserves the status quo if it prevents future trespasses but does not undertake to assess the pecuniary or other consequences of past trespasses."  Atlas Powder Co. v. Ireco Chems., 773 F.2d 1230, 1232 (Fed. Cir. 1985).  Thus, the status quo will be preserved by granting an injunction and preventing Defendant from continuing to infringe on Plaintiff's patent.

      Plaintiff also argues that an injunction is highly unlikely to put Defendant out of business, as the majority of its business is in Canada and because it has other product lines.  (Dkt. # 8 at 16.)  Defendant counters that an injunction would prevent it from conducting its business before it has a chance to vindicate

itself at trial.  (Dkt. # 22 at 21.)  "A record showing that the infringer will be put

out of business is a factor . . . but does not control the balance of hardships factor."

Aria Diagnostics, Inc. v. Sequenom, Inc., 726 F.3d 1296, 1305 (Fed. Cir. 2013).

The fact that a defendant is "'small' and could be put out of business if a

preliminary injunction issues does not insulate it from the issuance of a preliminary

injunction if the other three preliminary injunction factors are sufficient to tip the

scale in [the plaintiff's] favor.  Small parties have no special right to infringe

patents simply because they are small."  Bell & Howell Document Mgmt. Prods.

Co. v. Altek Sys., 132 F.3d 701, 708 (Fed. Cir. 1997).  The Court finds that at best,

the balance of harms factor is neutral; under such circumstances, the issuance of an

injunction is proper.  Abbott Labs., 849 F.2d at 1457–58.

IV.   Public Interest

        Finally, a plaintiff seeking a preliminary injunction must show that an

injunction is in the public interest.  In the absence of other relevant concerns, "the

public interest is best served by enforcing patents that are likely valid and

infringed."  Abbott Labs. v. Andrx Pharm., Inc., 452 F.3d 1331, 1348 (Fed. Cir.

2006).  Defendant argues that the interest in enforcing Plaintiff's patent is

outweighed by the public interest in allowing Defendant to continue competing

until the merits of the case are addressed.  (Dkt. # 22 at 22.)  Defendant has not

explained why the public has an interest in allowing Defendant to continue

operating.  To the extent Defendant suggests that the public would benefit from competitive pricing, the Federal Circuit has rejected such an argument.  See Payless Shoesource, Inc. v. Reebok Intern. Ltd., 998 F.2d 985, 991 (Fed. Cir. 1993) (noting that "selling a lower priced product does not justify infringing a patent" in weighing the public interest factor).  The Court thus finds that the public interest weighs in favor of granting an injunction.

CONCLUSION

For the reasons stated above, the Court hereby **GRANTS** Plaintiff's Motion for Preliminary Injunction.  (Dkt. # 8.)

**IT IS SO ORDERED.**

**DATED:** San Antonio, Texas, June 24, 2015.

_____
David Alan Ezra
Senior United States District Judge